# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
### CASE NO.: 16-CR-0084 (WMW/JSM)

UNITED STATES OF AMERICA,

                                 Plaintiff,

v.

DIANE L. KROUPA (2),

                                 Defendant.

**POSITION OF DEFENDANT REGARDING SENTENCING PURSUANT TO LOCAL RULE 83.10 OF THE U.S. DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

## CONTENTS

I.      Introduction

II.     Defendant's Biography

III.    Position of Defendant with Respect to the Sentencing Guidelines and the Sentencing Factors Set Forth in 18 U.S.C. § 3553(a)

    A.  Nature and circumstances of the offense and the history and characteristics of the defendant

    B.  The need for the sentence imposed

        i.   To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense

       ii.  To afford adequate deterrence to criminal conduct

     iii.  To protect the public from further crimes of the defendant

     iv.  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

    C.  The kinds of sentences available

    D.  The kinds of sentences available and sentencing range in the Guidelines

    E.  Any pertinent policy statement

    F.  The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct

    G.  The need to provide restitution to any victims of the offense

IV.    Identification of Any Issues in Dispute

V.      Reliance on the Final Presentence Report

VI.     Evidentiary Hearing

VII.    Conclusion

VIII.   Letters in Support of Defendant

IX.     Defendant's Statement to the Court (Verbatim)

X.      Defendant's Medical Records / Related Correspondence

XI.     Defendant's Tax Payment Transcripts

## I.      INTRODUCTION

Defendant, Diane L. Kroupa, by and through her attorney, Thomas M. Kelly, hereby submits her Position Regarding Sentencing in support of her request that the Honorable Wilhelmina M. Wright vary from the Guidelines and impose a sentence of 20 months imprisonment. In support of her request, she submits her biography, Position on Sentencing, letters from family and friends, and her own statement to the Court.

## II.     DEFENDANT'S BIOGRAPHY

Defendant, Diane Lynn Kroupa ("Kroupa") was born in Mitchell, South Dakota. She was one of five children all born within five years of each other. The closeness in age formed inherently strong bonds between her and her siblings. Kroupa went to a one room school house the first eight years of her education. There were 10 students total for all eight grades.

Kroupa went to high school in Kimball, South Dakota where there were 31 students in her class. Despite being brought up in such a rural location, she was active in everything and possessed a desire to discover the world that existed far beyond the cornfields and fences. Kroupa entered contests to win trips to the far off places that she had read about. She managed to travel to thirteen European countries and Russia while in high school. Kroupa became a foreign

exchange student and traveled to Finland to live with a host family in a suburb of Helsinki. During her stay, she frequently traveled with her host family to visit relatives in St. Petersburg, Russia.

As a student she traveled to Washington, D.C., through different programs and contests, including, "A Presidential Classroom for Young Americans".

While in high school, Kroupa became active in South Dakota politics. She served as a Page in the South Dakota Legislature. She also chaired the South Dakota Young Democrats and canvassed the state when Senator George McGovern ran for President. In college, she interned for the Congressman and one of the Senators from South Dakota.

Due to her political and international interests, it was recommended that Kroupa apply to Georgetown University and Princeton University because they were the only two colleges that had an established Foreign Service program. She was accepted at Georgetown, and received a B.S.F.S (Bachelor of Science in the Foreign Service) in 1978.

Upon graduating, Kroupa decided to pursue a law degree and went back to South Dakota to attend the University of South Dakota School of Law. While there, she participated on the Law Review.

After receiving her law degree in 1981, Kroupa married Robert Fackler, ("Fackler") and the two moved to Washington, D.C. where she took an Associate position in the Chief Counsel's Office at the Internal Revenue Service in Washington, D.C. She was part of the Honors Program which allowed her to receive a higher GS level, in return for committing to work for the government for four years.

During Kroupa's four year tenure she was an attorney in the Legislation and Regulations Division of the Chief Counsel's Office. Her division was responsible for drafting Federal tax

legislation and regulations. She worked closely with the House Ways and Means Committee and the Senate Finance Committee in drafting tax legislation. She represented the IRS in drafting sessions on whether the IRS could administer the proposed legislation.  After legislation passed, her group team was responsible to draft regulations to implement the legislation. Kroupa was one of four attorneys from the Division that was selected to speak at various tax conferences, including conferences for banks, brokers, and trade associations all across the country.  She received a Chief Counsel Award for Outstanding Performance.

In Kroupa's fourth year at the IRS, the President appointed the then IRS Chief Counsel to be a judge at the United States Tax Court.  The Chief Counsel in turned called on her to clerk for him. She finished her fourth year of government service at the U.S. Tax Court.

While Kroupa was working for the government, Fackler became the Regional Political Director for the Midwest for a national political party.  Regional Political Directors were required to live in their region.  During the four year period that Kroupa was working for the Government, Fackler lived and worked in the Midwest during the week, returning to D.C. only for the weekend.  This became normal throughout their marriage.  Fackler traveled so extensively that oftentimes Kroupa didn't know where he was as his schedule constantly changed.  In addition to being Regional Political Director, Fackler established himself as the national "expert" on ballot security and was sent to states where there were special or recall elections. This added even more time away to his schedule.

The couple had agreed to move to the Midwest when she was done with her four year commitment with the Government. They decided on Minnesota.  Kroupa joined Dorsey as an Associate in the Tax Department and was involved in tax planning and the tax effects on major transactions. Fackler started a lobbying business.  For his work, Fackler continued to travel

extensively around the country to meet with legislatures. In an effort to grow his client base, Fackler often organized various hunting and fishing trips, as well as took part in numerous golf tournaments.

Kroupa began seeking an opportunity that involved more client contact. She took an Associate position with a small Minneapolis based law firm. In 1988, Kroupa made Partner, and shortly afterwards the couple had their first daughter. At the firm, Kroupa was billing between 2,000 and 2,400 hours. Fackler continued to travel for his business. The couple had their second daughter in 1992. Kroupa, now having two small daughters and a husband who traveled, began to feel stressed in her role as Partner with the firm. Kroupa decided to seek a job where she would have more flexibility to balance work, family, and community commitments.

Kroupa was contacted by the Minnesota Governor's Transition Team to see if she was interested in becoming the Minnesota Department of Revenue Commissioner. That position ultimately went to another candidate. However, as a result of her applying, she was contacted a short time later to fill a judicial vacancy on the Minnesota Tax Court. She applied, interviewed, and was appointed as a Judge. Kroupa found she had flexibility in her schedule. Most days she was able to drop her daughters off and pick up them up from school. Kroupa eventually became the Chief Judge of the Tax Court where she continued to preside over trials and handled the administrative duties of case management and funding issues with the Minnesota Legislature. She oversaw a $600,000 budget, plus a $350,000 special appropriation for technology while serving as Chief Judge.

When Kroupa was not reappointed after her six year term concluded, she decided to seek her dream job of becoming a United States Tax Court Judge. While seeking a judgeship, she served as Special Counsel at Faegre and Benson. Kroupa was nominated and appointed a United

States Tax Court Judge with a 15 year term on June 13, 2003. She was one of nineteen judges who traveled to the 75 different cities to preside over cases.   As a Federal Judge based in Washington, D.C., her life, for a myriad of reasons, became more unmanageable. (Detailed information found in "Ms. Kroupa's Medical History) She traveled extensively for her job which kept her apart from her family who remained in Minnesota. Eventually, it all just took its toll.

Kroupa retired from her position as United States Tax Court Judge due to medical reasons on June 14, 2014. After retiring, Kroupa checked into Hazelden for alcoholism and chemical dependency and continued outpatient treatment at Kolmac Clinic in Washington, D.C.

Today Kroupa is immersed in Alcoholics Anonymous and attends daily meetings.   She has a sponsor and is working the Steps.   Kroupa has service positions and practices the AA principles in all of her affairs.

### III.     POSITION OF DEFENDANT WITH RESPECT TO THE SENTENCING GUIDELINES AND SENTENCING FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

Ms. Kroupa pled guilty to conspiracy to defraud the United States beginning in or before 2004 and continuing at least through in or about 2012, in violation of 18 U.S.C. § 371. Pursuant to the plea agreement, the base offense level is 18. A 2-level increase applies for abuse of position of public trust. An additional 2-level increase applies for obstruction to justice. The Government recommends a 3-level reduction for acceptance of responsibility. Based on the total offense level of 19 and a criminal history category of I, the guideline range of imprisonment is 30 to 37 months. Ms. Kroupa asks the Court to vary from the Sentencing Guidelines for a sentence of 20 months.

### A.     Nature and circumstances of the offense and the history and characteristics of the defendant

6

The typical conspiracy to defraud the United States case involves much greater sums of money than those at issue here. Ms. Kroupa is estimated to owe $457,104 to the IRS, the Minnesota Department of Revenue, the Comptroller of Maryland, and the Virginia Department of Taxation jointly and severally with her former husband, Robert Fackler. While the nature of the offense is serious, it is not a crime for which a person was a victim.

Ms. Kroupa's history and characteristics, as follows, shed light on the reason she committed this crime, as she has significant untreated psychological, emotional, and mental health issues.

MS. KROUPA'S MEDICAL HISTORY

You have copies of Diane Kroupa's medical records regarding her medical, psychological and emotional issues.  We focus on medical notes and records collected when she was admitted on August 16, 2011 to Mayo Clinic in Rochester for severe depression, suicidal thoughts and intermittent memory problems. Her medical history, diagnosis and treatment are well documented in the Mayo clinical records.  Here is a synopsis of her medical, emotional and psychological history based on the history collected and documented in the Mayo records in 2011 and counsel's discussions with Ms. Kroupa.

These facts do not absolve her of the criminal acts she committed. They provide instead the background for her actions.  Moreover, these facts were collected months and years before the criminal tax investigation began.  They have not been orchestrated to generate sympathy or to mitigate any criminal behavior.

The medical records document that Ms. Kroupa was the subject of persistent physical and verbal abuse by her mother and sexual, emotional and physical abuse by her father.  Her current therapist for over two years, Carol Husain, believes that Ms. Kroupa suffers from Post Traumatic

7

Stress Disorder (PTSD) from her childhood abuse. Ms. Husain's letter explains the medical symptoms and responses for PTSD, which generally causes disruption of mental processes when the patient is faced with a trigger or similar situation to the traumatic events. Ms. Husain believes that Ms. Kroupa's relationship with her husband was a trigger which caused significant distress to Ms. Kroupa and a dissociative state where her mental processes were blurred. Her work as a judge, which used the logical and analytical part of her brain, actually centered Ms. Kroupa and gave her comfort and relief from this dissociative state. This explains in part why she could have significant mental health issues resulting from the PTSD and still function as a judge.

Ms. Kroupa has had serious bouts of depression and major episodes of wanting to harm herself.  Ms. Kroupa's family history is frightening. Out of 13 aunts and uncles on her mother's side, eight of them have committed suicide. She has had several plans how to harm herself ranging from prescription drug overdosing, wrist slitting, planning car crashes, carbon monoxide poisoning and hanging.  She sought professional help in the 1990's but did not continue treatment due in large part to the stigma associated with mental illnesses.  At one point in the late 1990s or early 2000s, she started to act on plans to overdose.  She did not divulge this to her family nor was she hospitalized.  She also started to act on her plans in 2007 when she faced multiple extreme stressors: her isolation from her family (both physically and emotionally), her travel demands and those of her husband, her younger daughter's diagnoses of anorexia nervous, obsessive compulsive behavior, depression and anxiety along with related insurmountable medical costs and her housing situation (and the financial costs of paying rent on her apartment in Washington, D.C., the mortgage on the family home in Minnesota and hotel costs near her daughter's treatment facilities).  She realized then that she needed help and started seeing Dr. Pak, a psychiatrist at Park Nicollet in the Twin Cities. He prescribed her various psychotropic

medicines, which she continues to take. She has also been seeing a psychiatrist continually ever since.

Ms. Kroupa saw a number of doctors and medical professionals at Mayo in 2011. Her symptoms included depression, anxiety, insomnia, suicidal ideation, anhedonia, hopelessness, exhaustion, difficulty concentrating, chronic headaches, and intermittent memory issues (such as not recognizing her daughter and not realizing whether it was morning or evening). Her insomnia from racing thoughts and anxiety was so bad in 2011 that she had had several car accidents from almost falling asleep at the wheel. Her husband told the Mayo doctors that the family had been concerned about Ms. Kroupa's "overall mood symptoms and changes over the past year" - specifically, her difficulty sleeping, depression and memory issues. Her husband said she had demonstrated elements of disorientation, sometimes related to alcohol use, as well as slurred speech in the previous months.

Mayo screened her for bipolar disorder. Dr. Mark A. Frye, department head of Mayo's Mood Disorder Unit, is the leading authority and expert on bipolar disorder, depression and alcoholism. They found she had had hypomanic episodes followed by depressive episodes since she was in her twenties. Thus, she had had bipolar disorder for decades, but was not diagnosed or properly treated for years before she went to Mayo in 2011.

Bipolar disease has many symptoms. Bipolar disorder causes serious shifts in the mood and energy from highs of the mania on the extreme to the lows of depression on the other.  It is more than just feeling in a good or bad mood. The cycles last for days, weeks or months. During the manic phase, people with bipolar disorder have lots of energy and are capable of tremendous work and activity levels, but also tend to engage in risky behavior. Ms. Kroupa was very productive as a Tax Court judge. She described herself as a workaholic and able to outperform

her fellow Tax Court judges. That is at least partially explained when, in a hypomanic episode, she could produce more work than a normal person with only 2 to 3 hours of sleep. She also engaged in some erratic behavior such as lavish spending or ill-advised business decisions (other than her involvement in filing the 2004-2011 tax returns). Going on spending sprees while unable to pay for the items is the classic risky behavior people with untreated bipolar disorder engage in. Ms. Kroupa did that. She would convince herself that she was entitled to expensive things for working so hard then she would get buyer's remorse and get further depressed.

Ms. Kroupa also admitted at Mayo in 2011 that she had had a history of alcohol abuse especially in 2003 through 2009, but she believed that it had been under control since that time. The first instance of criminal tax evasion occurred during this period. Ms. Kroupa was abusing alcohol, had undiagnosed bipolar disease Type II, and possibly PTSD.

The Mayo records also consistently recount Ms. Kroupa's difficult family dynamics: her isolated relationship with her husband and living away from her family and friends, her difficult relationship with her younger daughter and her tenuous relationship with her older daughter. Ms. Kroupa was happier at work.  It invigorated her.  In fact, she was more stressed when she was home with her family.

Ms. Kroupa returned to work as a Tax Court judge after her stay at Mayo in 2011.  Her condition, however, did not stabilize. She still suffered from depression, mood swings and panic attacks. She admits that she was self-medicating with alcohol and prescription pain and sleeping pills to numb her feelings and overcome her stressors. She found it was every increasingly difficult to concentrate or even listen for extended periods of time. She started to slur her words, was unable to complete sentences, her hands shook and she would burst into tears at inappropriate times. It became increasingly more difficult for her to function as a judge.  On June

14, 2014, she retired as a Tax Court Judge due to a permanent disability. Attached are her letter and the letter of Dr. Pak supporting her resignation due to a permanent disability. All this took place after the search warrants were executed and it became apparent Ms. Kroupa was a target of the criminal investigation. This understandably caused extreme and additional stress. It exacerbated her long-standing psychological and emotional issues for which she has sought treatment.

Ms. Kroupa returned to Mayo as quickly as possible after she retired from the Tax Court. This time the focus was on her addictions to alcohol and prescription pain and sleeping pills. She stayed at Mayo for forty five days (first in the Mood Disorder Unit and then in the Addictions Department). After Mayo, she went to Hazelden for thirty days as Mayo had recommended. She then did intensive outpatient treatment for four months at the Kolmac Clinic in Washington, D.C. As part of her recovery both mentally and physically, Ms. Kroupa became active in Alcoholic Anonymous and has been an ardent and involved member and on August 6, 2017, she will have 3 years or sobriety. She has found a program in AA that helps her maintain her sobriety, both with alcohol and with prescription drugs. She has taken and continues to take steps to deal with her medical, psychological and emotional issues—not to mention her financial issues. And she should get credit for that.

Her diagnosis does not excuse her actions.  It does, however, help explain her actions. Ms. Kroupa sought help from psychiatrists and was not properly diagnosed by them. Ms. Kroupa remembers the Mayo doctors told her that she should get a psychiatrist different from Dr. Pak (presumably because he missed the diagnosis). The Mayo records acknowledge it is frequently hard to diagnose bipolar disorder type II. They advised her to continue work with a psychiatrist,

either her current one or another psychiatrist they had listed for her to seek help.  She in fact
continues to work with a psychiatrist and has monthly appointments with him.

Mental and emotional conditions may be relevant in determining whether a departure is
warranted in certain cases to accomplish a specific treatment purpose. U.S. Sentencing
Commission Guidelines Manual 5H1.3 (Nov. 1, 2015). Ms. Kroupa has the need for enhanced
outpatient mental health care or residential mental health care. A sentence of 20 months
imprisonment, followed by a term of supervised release is necessary as it would enable Ms.
Kroupa to receive treatment in the most effective manner.  The requested sentence would
provide adequate deterrence and just punishment while avoiding any unnecessary delay that
would hinder Ms. Kroupa's successful treatment.  Any additional prison time beyond the
requested 20 months would have marginal deterrent value and would only hamper Ms. Kroupa's
successful recovery. Ms. Kroupa's mental health conditions include bipolar disorder, major
depressive disorder, and PTSD. Rarely will an inmate receive meaningful treatment for
underlying disorders such as these. *See* Alan Ellis and Mark Allenbaugh, *Mental Health Care in
the Bureau of Prisons*, The National Trial Lawyers (Apr. 13, 2017). Treatment options in prison
are extremely limited and would not be nearly as conducive to Ms. Kroupa's recovery as out of
custody options. Accordingly, a downward variance from the recommended Guidelines range is
warranted as it will provide Ms. Kroupa with needed treatment in the most effective manner.

As discussed in her medical history, Ms. Kroupa's bipolar disorder caused, among other
things, risky behavior, such as spending money that she did not have. Accordingly, because Ms.
Kroupa's mental health status contributed to her actions, it should be considered by the Court in
imposing a sentence. These issues lessen her culpability for her actions and favor of a downward
variance.

12

The fact that Ms. Kroupa has absolutely no adult or juvenile criminal history also provides a basis for a downward variance. In fact, prior to the current charges Ms. Kroupa had never even been arrested or charged with a crime. Given Ms. Kroupa's lack of criminal history and low risk for recidivism, the requested sentence of 20 months imprisonment will provide just punishment and adequate deterrence.

Ms. Kroupa should be sentenced to 20 months imprisonment, a downward variance from the Guidelines range because such a sentence provides just punishment, adequate deterrence, and will enable Ms. Kroupa to receive requisite treatment and counseling. In imposing a sentence, Section §3553(a) directs the Court to consider the need to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

### B.        The need for the sentence imposed

#### i.  *To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

The position of Ms. Kroupa is that a sentence of 20 months imprisonment is a fair sentence. The recently approved report, The American Law Institute's Model Penal Code: Sentencing, provides for a prohibition on unnecessary severity of criminal punishments: "The principle embodies a policy preference for use of the least restrictive alternative in individual criminal sentences, but also guards against the needless expenditure of correctional resources." Model Penal Code: Sentencing at 11 (Am. Law Inst., Proposed Final Draft, 2017).

Imprisonment for 20 months will be a hardship for a retired judge who committed a non-violent crime and would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

*ii.  To afford adequate deterrence to criminal conduct*

A lengthy imprisonment sentence is not necessary to adequately deter future criminal conduct by Ms. Kroupa. A recent study by the National Research Council regarding the causes and effects of high rates of incarceration found that "the incremental deterrent effect of increases in lengthy prison sentences is modest at best. Because recidivism rates decline markedly with age, lengthy prison sentences, unless they specifically target very high-rate or extremely dangerous offenders, are an inefficient approach to preventing crime by incapacitation." National Research Council, J. Travis, et al., *The Growth of Incarceration in the United States: Exploring Causes and Consequences* 5 (2014) ("National Research Council Report"). The study noted that "research on deterrence suggests that would-be offenders are deterred more by the risk of being caught than by the severity of the penalty they would face if arrested and convicted."  *Id*. at 4. The study concluded that "given the small crime prevention effects of long prison sentences and the possibly high financial, social, and human costs of incarceration, federal and state policy makers should revise current criminal justice policies to significantly reduce the rate of incarceration in the United States. In particular, they should reexamine policies regarding mandatory prison sentences and long sentences. Policy makers should also take steps to improve the experience of incarcerated men and women and reduce unnecessary harm to their families and their communities." *Id*. at 9. Specific and general deterrence is accomplished by the criminal investigation and charging of Ms. Kroupa.

*iii.  To protect the public from further crimes of the defendant*

Ms. Kroupa has no serious criminal history. She has not been investigated for any wrongdoing other than the current investigation. There is little risk of recidivism and she has

committed a non-violent crime. She has a strong potential for rehabilitation. Ms. Kroupa presents no safety risk to the public.

> iv. *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most efficient manner.*

Ms. Kroupa has a real need for medical care in the form of mental health treatment. A sentence of 20 months will allow Ms. Kroupa to receive a just and appropriate punishment while also not preventing her from receiving the treatment she needs upon her release.

### C.  The kinds of sentences available

Ms. Kroupa is ineligible for probation.

### D.  The kinds of sentence and sentencing range in the Guidelines

The Guidelines provide a range of incarceration of 30 to 37 months. Ms. Kroupa believes that the Guidelines calculations should be modified by a variance of 20 months imprisonment. The Guidelines are only one of seven equally important factors the Court is to consider in determining a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.

### E.  Any pertinent policy statement

Ms. Kroupa has found no applicable policy statement.

### F.  The need to avoid unwarranted disparities

Ms. Kroupa's former spouse, Robert Fackler, is also to be sentenced on the same conduct as Mr. Kroupa. Ms. Kroupa should not be sentenced in a disparate manner from Mr. Fackler. In his position on sentencing, Mr. Fackler accuses Ms. Kroupa of exerting control over him and eventually intimidating him so much that he was obliged to do what she demanded. Mr. Fackler argues that Ms. Kroupa kept him relatively passive and took full advantage of her intelligence

and emotionally controlling abilities. While Mr. Fackler knew it was wrong to mislead the IRS, he simply followed Ms. Kroupa's demands for more money.

Ms. Kroupa takes issue with this position. While Ms. Kroupa and Mr. Fackler did have a complicated relationship, she in no way manipulated him into committing a crime.  The parties have gone through an acrimonious dissolution in which they cast a great deal of blame upon each other. The failure to report their income was the fault of both parties equally. The parties committed these acts together during their marriage.

In its position paper with respect to sentencing Mr. Fackler, the Government urges the Court to take into consideration that Mr. Fackler admitted his tax fraud soon after being charged and agreed to plead guilty well before Ms. Kroupa. Ms. Kroupa was entitled to a review of the discovery against her with legal counsel. Ms. Kroupa was residing outside of Minnesota, which made that review of discovery more difficult to arrange. Once she had completed that review and discussions with counsel, she promptly entered into negotiations to resolve the case.

The Court should not consider these arguments as a basis for disparately sentencing Ms. Kroupa and Mr. Fackler.

> **G.**      **The need to provide restitution to any victims of the offense**

Pursuant to the plea agreement, Ms. Kroupa agrees to pay restitution in the total amount of the tax loss created by her conduct. She has already made substantial payments toward restitution and has liquidated all of her assets to do so.

## IV.      IDENTIFICATION OF THE ISSUES IN DISPUTE

Ms. Kroupa does not dispute any issues.

### V.   RELIANCE ON THE FINAL PRESENTENCE REPORT TO RESOLVE THE DISPUTE

Although Ms. Kroupa does not dispute any issues, the Court can rely on a careful reading of the facts of the PSR.

### VI.   REQUEST FOR AN EVIDENTIARY HEARING

Ms. Kroupa does not request an evidentiary hearing.

### VII.   CONCLUSION

Ms. Kroupa requests that the Court vary from the Sentencing Guidelines. Reasons exist to support a variance, namely, that Ms. Kroupa has serious untreated mental health, psychological, and emotional issues that caused her to commit these acts. A shorter term of imprisonment is necessary to allow her to receive the treatment she needs upon her release. Further, Ms. Kroupa does not have a criminal history and is very unlikely to re-offend.

### VIII.   LETTERS IN SUPPORT OF DEFENDANT

Due to the personal information they contain, Letters in Support of Defendant were filed through ECF using the "Letters E-mails and Other Sentencing Hearing Materials" event under the menu "Criminal, Restricted Filings, Restricted Other Documents."

### IX.   DEFENDANT'S STATEMENT TO THE COURT (VERBATIM)

Your Honor:

I stand before you a shamed, disgraced, destroyed and remorseful woman. I am human. I made mistakes. Mistakes I cannot retract. Mistakes I regret having committed. Mistakes I am responsible for and own up to. I am here to accept the consequences of my mistakes.

I took an oath to uphold the law to the best of my ability. My ability was not the best, however, when I succumbed to various pressures. I lost my core values in dealing with my financial, medical and living situations. I had family medical issues including my own

17

undiagnosed and untreated health conditions and addictions. I was also isolated from my family and strong support system when I moved to D.C. and they remained in Minnesota. In addition, I traveled extensively to hear cases and constantly lived out of a suitcase.

I have let the public down with the poor decisions I have made. These decisions have shattered my life and my reputation that took me decades to establish. These decisions have shamed me. Far more importantly though, they have hurt my family and friends. I am so sorry. I strove to be a role model and an example of the virtues of dedicating one's life to public service and volunteerism as I have. Instead, I have brought shame to those I love. No words can express the sorrow I have.

Please know that whatever sentence you impose will be in addition to the life sentence I am already serving. I will have to live with my mistakes for the rest of my life.

Thank you your honor.

## X.    DEFENDANT'S MEDICAL RECORDS / RELATED CORRESPONDENCE

Due to the personal information they contain, Defendant's Medical Records / Related Correspondence were filed through ECF using the "Letters E-mails and Other Sentencing Hearing Materials" event under the menu "Criminal, Restricted Filings, Restricted Other Documents."

## XI.    DEFENDANT'S TAX PAYMENT TRANSCRIPTS

Due to the personal information they contain, Defendant's Tax Payment Transcripts were filed through ECF using the "Letters E-mails and Other Sentencing Hearing Materials" event under the menu "Criminal, Restricted Filings, Restricted Other Documents."

Respectfully Submitted,

Dated: <u>June 9, 2017</u>                    <u>s/Thomas M. Kelly</u>
                                         Thomas M. Kelly
                                         Attorney Reg. No. 54914

                                         KELLY & JACOBSON
                                         200 South Sixth Street, Suite 420
                                         Minneapolis, Minnesota 55402
                                         Telephone: (612) 339-5055
                                         Facsimile: (612) 339-7851

                                         Attorney for Diane L. Kroupa